IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| ELLEHUGH CROSS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| | * | |
| vs. | * | No. 4:04cv00949 SWW |
| | * | |
| | * | |
| | * | |
| | * | |
| UNITED AUTO WORKERS, LOCAL | * | |
| 1762, IC CORPORATION (FORMERLY | * | |
| AMERICAN TRANSPORTATION | * | |
| CORPORATION), | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER

This is an action brought under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to redress separate defendant United Auto Workers, Local 1762's (hereinafter "Union") alleged breach of its statutory duty of fair representation and separate defendant IC Corporation's (or the "Company") alleged wrongful discharge of plaintiff Ellehugh Cross following a disturbance at work that allegedly constituted breach of the collective bargaining agreement. The following motions are before the Court: (1) motion of IC Corporation for summary judgment [doc.#10]; and (2) motion of the Union for summary judgment [doc.#14]. Plaintiff has responded in opposition to both motions, and IC Corporation has filed a reply to plaintiff's response. For the reasons that follow, the Court finds that the IC Corporation's and

Union's motions for summary judgment should both be and hereby are granted.[1]

I.

Plaintiff started working for American Transportation Corporation in 1975. The company later became IC Corporation and manufactures chassis and school buses in Conway, Arkansas. The production and maintenance employees at the company's Conway facility are represented by separate defendant United Auto Workers Union, Local 1762.[2]

At the time of his discharge, plaintiff was working material control in the warehouse on the day shift, and his job responsibilities included such things as riding forklifts and pulling parts. Plaintiff had been a member of the Union for approximately six to seven years, although he had never participated in Union elections. Prior to his discharge, plaintiff had filed two previous grievances through the Union, both of which were resolved to his satisfaction.

This action arises out of an incident that is alleged to have occurred on December 17th, 2002. Plaintiff states that during his lunch break on that day, David Payne, plaintiff's coworker, approached him from behind and attempted to throw him in a trash dumpster. Specifically, plaintiff states Payne "ran his hand between my legs, caught me in my crotch and caught me

---

[1] IC Corporation's motion to strike plaintiff's response as untimely, while perhaps technically correct, is denied as moot given that the Court in any case grants IC Corporation's motion for summary judgment.

[2] The Court has viewed the facts in the light most favorable to plaintiff as required at this stage of the pleadings. In addition to taking facts from the Stipulation of Agreed Facts to which all parties have agreed, the Court has also deemed admitted certain facts set forth in the defendants' respective Statement of Material Facts to which they contend no genuine issues exist to be tried that plaintiff has not controverted in his own Statement of Material Facts. *See* Local Rule 56.1(c), which provides that "[a]ll material facts set forth in the statement filed by the moving party pursuant to paragraph (a) shall be deemed admitted unless controverted by the statement filed by the non-moving party under paragraph (b)."

around my neck and tried to pick me up and throw me in the dumpster." Plaintiff states this was the second time this had happened, the first occurring in November, although he never complained to management after that first incident. Plaintiff states he did, however, have words with Payne, telling him that horseplay was not allowed "because someone could get seriously hurt." Plaintiff states that after the incident on December 17th, he was sitting at the table finishing his lunch break when Payne "reached over the table and slapped me on the face." Plaintiff states he told Payne that "[t]his stuff will have to cease," and that "[w]e're going to have to go to Personnel and have a talk with Personnel, because this is not right." Plaintiff states, however, that other workers told him not to go to Personnel and to let it be. Plaintiff acknowledged that according to the Company's safety rules, fighting or horseplay is a cause for discharge.

      Payne's version of the incident differs. According to Payne, plaintiff was interrupting him and that he pulled the bill of plaintiff's cap and told him to hold on a minute. At that point, states Payne, plaintiff pulled out a pocket knife, walked around the table, and hit him three or four times on the leg with the knife eventually coming through the pant leg. Payne states he looked at his leg and noticed blood and that plaintiff made a derogatory comment. At the time of the December 17th incident, plaintiff had a knife on his person, stating that all the workers carry little knives, and that the knife he was carrying that day was a "little" pocket knife. Plaintiff denies having gotten the knife out at all, however, stating that if Payne had blood on him, he might have gotten it "off the back of my hand" because "I was the one that got cut on the dumpster on the leg and the hand."

      Payne states he left work and reported the incident the following morning. In this respect,

Payne went to the Human Resources Department where he was interviewed by Wayne Johnson, Vice President of Human Resources, John Mattox, Director of Health, Safety and Security, Suzie Brewer, Labor Relations Manager, and Phillip Burks, Union Representative. Payne was also examined by the Company's on-site physician, Dr. Steve Long, who reported that Payne's wound could have been caused by a small knife.

Concerning witnesses to the incident that were identified by plaintiff, Troy Wiseman, a friend of plaintiff, testified, among other things, that plaintiff and Payne were mouthing off, that Payne pushed plaintiff's head like they were playing, and that plaintiff came around the table and had his arms out while Payne had both of his arms, and they were moving around for seven or eight seconds. Wiseman states he did not see any blood on Payne but that plaintiff may have had a cut on his hand. Wiseman did not refer to Payne attempting to throw plaintiff in a dumpster on the day in question, stating that particular incident happened previously. Richard Lockhart, plaintiff's brother, testified, among other things, that Payne hit plaintiff "up side the head," that plaintiff got mad, that they "then they kind of locked up a little bit," and that Payne tried to pick up plaintiff and throw him in the dumpster. Lockhart states he did not see any blood or scratches on Payne, but states that plaintiff had a cut on his leg. A third person present, Douglas Dale, states he did not witness the incident – having left the room for about five minutes – but does state that he saw some "brown stuff" on Payne's leg but that it was not for him to say it was blood as "we work and we get all dirty and stuff like that...."

Following Payne's report of the incident the previous day, plaintiff, on December 18th, was called into the Personnel office. Plaintiff proceeded to the Personnel office accompanied by his Supervisor, Donnie Fowler, at the instruction of Mattox. Prior to arriving at the office,

4

plaintiff states he gave his knife to Fowler as Fowler told him about the fight and that Payne had reported getting "cut" by plaintiff. That, states plaintiff, is why he gave Fowler the knife. Fowler, however, states that Mattox did not tell him why he was requesting that plaintiff be brought to the office, that he did not know anything about the incident at the time, and that plaintiff gave him the knife and other items to put in his locker stating that he probably wouldn't be back to work that day. In any case, waiting for him at the personnel office were, among other individuals, Phillip Burks, the Union steward, and two policemen. The policemen informed plaintiff that Payne had made accusations against him and thereupon arrested plaintiff, charging him with battery. Plaintiff states that Burks was concerned and tried to represent him at that point and that he (plaintiff) "run through a few things" but that the policemen took him away before Burks could get anything done. Plaintiff bonded out of jail that same day.[3] Later that day, Fowler turned the knife over to Mattox, who then turned it over to the Conway Police Department.

In the ensuing days, plaintiff talked with Burks a few times. He also met with Larry Maxfield, a United Auto Workers Bargaining Chairman who handles all the grievance procedures for the Union, and Tim Boley, a Union Steward, to give his side of the story. This meeting, which took place off company grounds as plaintiff was suspended from work pending the Company's investigation, occurred on December 30th. Maxfield arranged for plaintiff to go back to the company to give a recorded statement concerning his version of the incident to Company Human Resources Department representatives. Plaintiff was accompanied by a Union

---

[3] Following his release from jail, plaintiff filed a complaint against Payne arising out of the incident on December 17th. In a letter to the Conway City Attorney dated December 9, 2003, Chief Deputy Prosecutor Marcus Vaden stated that it was his opinion that plaintiff was guilty of battery and that plaintiff's attempt to file a complaint against Payne was "a feeble attempt to direct attention away from [plaintiff's] guilt" and that the charges against Payne should accordingly be Nolle Prossed.

Steward at that meeting. At the conclusion of the investigation, Johnson and Mattox determined that the preponderance of the evidence indicated that plaintiff had gotten mad, come around the table and stuck plaintiff in the leg with a small knife.

On December 30th, 2002, the Union filed two grievances on behalf of plaintiff pursuant to the Collective Bargaining Agreement. One grievance was filed in order to address the unjust disciplinary action against plaintiff, and the other dealt with the company's failure to provide plaintiff with due process. The following day, on December 31st, 2002, the Company sent plaintiff a termination letter stating that the reasons for his discharge were (1) fighting on company property; (2) threatening or intimidation of any person on company property, and (3) horseplay or any incident, which may cause injury to another person. Johnson made the final decision to terminate plaintiff. Payne was suspended without pay for three days for engaging in horseplay with plaintiff at the table on December 17th, 2002.

Both grievances were denied by the Company at Step 3. Maxfield states that his strategy at Step 3 of the grievance procedure was to emphasize plaintiff's seniority and work history, the fact that no witnesses saw a knife, that testimony of the witnesses concerning the presence of blood was ambiguous, and that the punishment as between Payne and plaintiff was too severe. Suzie Brewer, as previously noted, Labor Relations Manager, states that the factual basis upon which the Company relied to conclude that plaintiff employed a weapon was seeing Payne's leg, the pictures of his wound, and the statements that were given.

Having been unsuccessful in having plaintiff reinstated, Maxfield advanced the grievance procedure to Step 4 and passed all the statements and information he had gathered to the International Representative, Clay Harris. At that point, the local Union representatives met with

Harris and the position advanced on behalf of plaintiff was that he be given a last chance agreement and reinstatement on that basis. The Company declined to give plaintiff a last chance agreement as they felt plaintiff was guilty of stabbing Payne. Rather than withdrawing plaintiff's grievances at that point, the Union decided to place a hold on the grievances pending disposition of plaintiff's criminal case. Brewer states it was normal procedure for the Company and the Union to both agree to do that. However, given that workplace violence was involved and the Company's determination that, regardless of the outcome of any criminal proceeding, plaintiff had engaged in workplace violence, Maxfield states that the Union ultimately decided to withdraw plaintiff's grievance and not to seek arbitration as, based on previous cases involving workplace violence and threats, it was felt such an arbitration would be unsuccessful.[4] The Union informed plaintiff by letter that his grievance was withdrawn. No appeal of the Union's decision not to arbitrate was made by plaintiff.

On March 19th, 2004, the criminal charges filed by Payne against the plaintiff were dismissed, *nolle prosequi*, at the request of Payne.

II.

IC Corporation and the Union both move for summary judgment on grounds that plaintiff cannot prove that the Union breached its duty of fair representation and he cannot prove that IC Corporation breached the collective bargaining agreement as the record establishes he was terminated for cause. Both defendants argue that there are no genuine issues of material fact with

---

[4] In this respect, Maxfield testified that very few grievances are arbitrated. Brewer testified that someone from the Union stated, erroneously it turns out, that plaintiff had pled guilty to the charges of battery, but that she didn't know if the Company's position and the withdrawal of the grievance would have been different had that information not been presented.

respect to these issues and that they are entitled to summary judgment as a matter of law.[5]

A.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The nonmoving party may not rest on mere allegations or denials of his pleading, but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id*. at 587 (quoting Fed.R.Civ.P. 56(e) and adding emphasis). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citations omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. (citation omitted).

---

[5] Defendants also argue plaintiff did not exhaust his remedies to which plaintiff responds that any such exhaustion would have been futile. Given that defendants are entitled to summary judgment even if plaintiff exhausted his remedies, it is not necessary to resolve this issue.

B.

In order to prevail in a hybrid claim under § 301 against both an employer and a union, an employee must prove both the union's breach of its duty of fair representation and the employer's breach of the collective bargaining agreement. *Scott v. United Auto.*, 242 F.3d 837, 840 (8th Cir. 2001) (citing *Vaca v. Sipes*, 386 U.S. 171, 186-87 (1967)). A Court must find unfair representation by the union before considering the merits of a § 301 claim against an employer. *Buford v. Runyon*, 160 F.3d 1199, 1201 (8th Cir. 1998). A union will be found to have breached its duty of fair representation only when its conduct is arbitrary, discriminatory, or in bad faith. *Baxter v. United Paperworkers Intern. Union, Local 7370*, 140 F.3d 745, 747 (8th Cir. 1998). To survive a motion for summary judgment on the issue of bad faith, an employee must demonstrate fraud, deceitful action, or dishonest conduct be the union. *Id.* "Mere negligence, poor judgment, or ineptitude by a union is insufficient to establish a breach of the duty of fair representation." *Buford*, 160 F.3d at 1202.

The Court has carefully considered the matter and finds nothing in the record indicating that the Union's representation of plaintiff was arbitrary, discriminatory or in bad faith. As stated above, the Union's strategy at Step 3 of the grievance procedure was to emphasize plaintiff's seniority and work history, the fact that no witnesses saw a knife, that testimony of the witnesses concerning the presence of blood was ambiguous, and that the punishment as between Payne and plaintiff was too severe, while the position advanced on behalf of plaintiff at Step 4 was that he be given a last chance agreement and reinstatement on that basis. The Company declined to give plaintiff a last chance agreement, however, as they felt plaintiff was guilty of stabbing Payne, and the Union ultimately decided to withdraw plaintiff's grievance and not to seek arbitration as,

based on previous cases involving workplace violence and threats, it was felt such an arbitration would be unsuccessful, a determination plaintiff did not appeal. In this respect, plaintiff has not demonstrated that the Union's representation was "perfunctory," *i.e.*, "conduct that is no more than going through the motions, involving no real effort to put forward a position." *Stevens v. Highway, City & Air Freight Drivers*, 794 F.2d 376, 378 (8th Cir. 1986). While plaintiff's dissatisfaction with the outcome is understandable, he was given an opportunity to present his side of the story and present evidence in his behalf. Plaintiff has not demonstrated that the Union's strategy in representing him was either arbitrary, discriminatory, or perfunctory.

Plaintiff alleges the erroneous information regarding his having pled guilty to battery was in bad faith – that the union representative lied – but there is no evidence demonstrating that this action was anything other than mistake or negligence; there simply is nothing in the record demonstrating that this action was fraudulent, deceitful, or dishonest. *Cf. Danychuk v. Des Moines Register*, 128 F.3d 653, 653-54 (8th Cir. 1997) (upholding district court's decision that the union's decision not to arbitrate was not a breach of the duty of fair representation where it was not motivated by any animus against the employee).[6] Accordingly, plaintiff's claim that the Union breached its duty of fair representation is without merit. Because plaintiff cannot establish unfair representation by the Union, his claim against IC Corporation for breach of contract must also fail.

---

[6] In this respect, a plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence on which the jury could reasonably find for the plaintiff. *Bass v. SBC Communications, Inc.*, 418 F.3d 870, 872-73 (8th Cir. 2005). This plaintiff has failed to do with respect to his allegation that a union representative lied concerning plaintiff having pled guilty. The Court notes also that plaintiff does not demonstrate that the result would have been different had such information not been presented, and indeed, it was the Company's determination that, regardless of the outcome of any criminal proceeding, plaintiff had engaged in workplace violence.

III.

For the foregoing reasons, the Court finds that IC Corporation's and the Union's motions for summary judgment should both be and hereby are granted. Judgment will be entered accordingly.

IT IS SO ORDERED this 15th day of September, 2005.

<u>/s/Susan Webber Wright</u>
UNITED STATES DISTRICT JUDGE